If the court please, Karl Oreskevich, Courtney Garcia, and Steve Lamberson for the appellant, Officer Thompson. Judge, I'd like to reserve five minutes, if I might, for rebuttal. The timing of the initial encounter was a linchpin of the government's case. It characterized that initial encounter as strike first, ask questions later. And it referenced the initial encounter 17 different times in its opening statement and 28 different times in its final argument. It knew that the security video upon which it relied could be easily misinterpreted and based its case upon a video interpretation that its only forensic video expert rejected and told them was a misinterpretation. The government didn't disclose that opinion. It concealed that opinion from the defendant, from critical witnesses who testified at trial, and used in one instance that interpretation of the surveillance video itself to change the exculpatory testimony of an eyewitness who had previously testified, who had previously given statements to both the state investigators as well as the FBI that the defendant had issued commands prior to the time that baton strikes occurred. The suppression of this evidence undermines confidence in the outcome of the trial. Well, let me stop you there because I guess what I'm having trouble with in terms of your case on the Brady front is that the government never called this expert to testify, right? So it's not like the jury was exposed to the opinions of someone and the government hid stuff that would have undermined those opinions, right? And your client had his own expert who, as I understand it, testified to many of the same things that you say that Mr. Fredericks would have, right? So I guess you've got to walk me through why you think there was prejudice there. For many different reasons, Judge. First of all, the fact is that the expert witnesses who rendered opinions, that would have been Dr. Gill who rendered opinions concerning the timing of the baton strikes as well as opinions concerning whether or not Officer Thompson had sufficient time to render the commands that he said that he gave in his statement, which became the basis for count two, is not a video expert. Neither were the use of force experts. They were not video experts, and the government knew to begin with, from what Mr. Fredericks told them, that the interpretation, that the video, number one, could be misinterpreted by lay people, that what they were offering was a misinterpretation. So what the government allowed to occur, Judge, is to have the experts who testified who were, for all practical purposes, only lay witnesses as it pertains to video interpretation, to testify as to an opinion that it knew, based upon the expertise of its own expert, was not accurate. I mean, I have a hard time reconciling that with Mr. Fredericks' grand jury testimony. He said, without qualification, that that first, I think it's that first supposed strike he's asked, is what we're seeing on the video consistent with a baton strike? Those are the exact words that the AUSA used. And he says, yes, it is. So he may have other opinions that, well, it could have been consistent with other things, too, but it's not as though he says, absolutely not, there's no way that piece of video can be interpreted as consistent with a strike. He says it before the grand jury under oath. He does say it under oath. Interestingly, he is the only retained expert that's taken into the grand jury and questioned under oath. But more importantly, Judge, the history leading up to that questioning in front of the grand jury, there was a lot of dynamics in give and take between the U.S. attorney and Mr. Fredericks. Right. And there was an explanation by Mr. Fredericks that the baton in that frame was consistent with a baton strike, but it was consistent with many other things, right? Right. So if you take it out of context and you look just at the grand jury testimony, right, you can say, well, he makes the admission. But his total testimony framed in the entire context is consistent with the baton strike. It is consistent with a defensive posture, right, in terms of crouching, he says. And his opinion is – But just let me be clear. Okay. You said that the government's case was built around this expert opinion that actually, you know, the experts sort of disavowed. And I guess I'm saying I don't see the distinction as being nearly that sharp. He's saying – Mr. Fredericks is saying it could be consistent with what you, the government, would like it to be. Maybe it could be consistent with these other things. But he's not saying that it's – I'm able to exclude this piece of video as being consistent with a baton strike. He says it's one of the things it could be consistent with. And that's why it's exculpatory. The fact that it may be consistent with an inculpatory or incriminating interpretation, all the other scenarios that he offers in terms of consistent with other purposes, other explanations, including corroborating the testimony of Officer Thompson, Judge. But you had an expert at Testify Trial who gave that very opinion. So what's so special about Mr. Fredericks? That's what I don't get. One, he would have changed the trial strategy, Judge. Had the government got up in its opening statement and said 17 times about the initial encounter, that it would strike first and ask questions later, the ability to get up in the defense opening statement and to say what the government didn't tell you is that his very own expert doesn't agree with that interpretation of the video. It's only for – Well, you know, that's one of the other couple issues I have that I'm – hopefully you'll illuminate for me. Okay. So let me start with what information did you have on Fredericks before the trial? We had – before the trial, we had Mr. Fredericks' original report. Yes. Okay. We then had a rule 16 disclosure by the government, at least referencing to Fredericks expecting to testify to two baton strikes. Right. We had a supplemental report by Mr. Fredericks where information had been taken out at the insistence of the U.S. attorney. We had then the – You had the grand jury testimony. The grand jury testimony. So basically you had the lay of the land as to how one might counter Mr. Fredericks were he to testify, right? No. Why? Well, Judge, the 302, for instance, as evidenced by what Judge Van Sickle said, misled us as well as the rule 16. Well, you had his report. We had an original report from 2007, and every document that we received after that said, and in fact the 302 said, Fredericks admitted in a March 2007 meeting with the government, at least that's what the 302 said, that he missed the first two baton strikes, right, that he didn't study the images close enough. But then when he comes to testify, and then he's confusing and contradictory after the fact, isn't he? He doesn't give you a clear line that there were or were not baton strikes, even in his post-trial depositions and the discovery that you did. Judge, he says that, at least with respect to the video, at the first place that they see a baton strike, 1826.14, that it's not a baton strike. He says at 1826.16, which is the second place, that the video doesn't demonstrate a baton strike, in my opinion. Well, I guess one of the issues I had, too, is that he intermingles his terms, even after the fact. So I, you know, it shows perhaps a baton movement, and I know there's a strike we think sometimes means, you know, that he struck the individual. But he mixes and matches, does he not, his use of how he characterizes this movement? There are different words that characterize movement, and it's not quite as precise as perhaps we'd all like the record to be. But what comes out of that is that he's very clear with the U.S. Attorney. And what he offers, different than Mr. Schott, he offers specifically a description of what constitutes motion blur. And he tells him about the significance of motion blur and why their interpretation of an image in some of the frames, particularly the last series of frames, 70 through 76, is not a baton strike. And he demonstrates for Mr. Durkin how it is that Mr. Officer Thompson simply could be walking in and carrying the baton and how that, in the absence of him be moving forward, and that could be an explanation or was an explanation as to what occurred at that point in the video. You had your own video expert, right? Yes, Judge. Wasn't that the only video expert that testified? He was the only video expert that testified. So why didn't you, in essence, get your position before the jury? Well, Judge, we didn't get our position before the jury because our video expert didn't hold the same opinions as Mr. Fredericks. There was some overlap. I don't dispute that fact. But Mr. Fredericks was quite clear, first of all, Judge, in terms of his characterization of the video as being easily misinterpreted by laypeople. He was very clear in terms of his discussion about motion blur and why motion blur is significant. He was very clear in the demonstration to the U.S. attorney about why the images in the video were not baton strikes, and he demonstrated that alternative to the U.S. attorney. And so the character of his testimony, some of the basis that he relied upon, was uniquely different than what our expert relied upon. Can you just bring me back to the grand jury testimony? Because that, I guess, is what really struck me as being problematic for you. So just reconcile what you've just been saying in response to my colleague's questions with that one answer that he gives that, yes, what we just saw on the video is consistent with a baton strike. How do you reconcile those two things? I can't rely simply on the grand jury testimony in and of itself. It's a statement under oath. I don't disagree, right? But it is a statement in an entire universe or an entire context of statements. And we all know that in a grand jury there's no cross-examination. The United States doesn't have to ask the follow-up questions that they had asked in their preliminary meeting up to that. I know. But what you've been telling us, it seems to me, if Mr. Frederick's really held the opinions that he's now professing, he would have had to answer that question, no, it's not consistent with a baton strike, right? I don't think so, Judge. He's demonstrating to the jury, I mean, in terms of his answer, I think demonstrates the very fact that it can be easily misinterpreted. But he's unequivocal in his answer. So either he's misrepresenting something to the grand jury or that's his definitive answer. Which is it? Well, Judge, I don't think he's misrepresenting anything. I mean, I don't believe that to be the case. But if you look at one image, which he was asked about, what was one image, and the explanation is, well, if you look at that one image, it can be consistent with a baton strike. We would have to do an analysis of a whole series of images, not many really, 68 through 76, but his testimony has to be viewed in terms of an entire context. And that's what we were deprived of. That's what the jury was deprived of hearing. They didn't have the opportunity to hear the explanation or to see the demonstration as to why it wasn't a baton strike. So an admission, is that consistent? Well, you could say it's consistent. It's consistent with incriminating conduct, at least that one image, or it's consistent with exculpatory conduct. But his opinion is, is that at those frames of the video in totality, that baton strikes didn't occur. I have two minutes and 30 seconds. Should I, might I say it or are there more questions? We might have some more, but we'll give you some extra time if we do. Thank you, Judge. Good morning. May it please the Court. Jennifer Levin, ICORN, on behalf of the United States. I'm here at council table with Assistant U.S. Attorney Tim Durkin, and in the gallery is Special Agent Lisa Jangard. Mr. Durkin was prepared to address the jury instructions and the alleged jury misconduct, but given the focus here on Brady, that's where I will be. The district court's conclusion that withheld information was not prejudicial to the defendant and therefore did not establish a reasonable probability the verdict would be different was correct and should be affirmed for at least five reasons. There are several categories of evidence to support the verdict. Contrary to the defendant's suggestion, the video is not the be-all and end-all of the proof of the defendant's actions in this case. And significantly, Mr. Frederick's opinions would not change the defendant's story. He said he's never wavered from his statement that he made two baton strikes at Mr. Zimm before Mr. Zimm fell to the floor. Whether or not Mr. Frederick can see those two strikes on the video doesn't change the import of the defendant's admission. Mr. Frederick's opinions on whether or not he can see these strikes is irrelevant to the defendant's claim that Mr. Zimm took an aggressive, stationary position before he committed those first two strikes. And in fact, again, in his grand jury testimony, he said when he looked at it that Mr. Thompson never stops moving, which is again contrary to the defendant's statements. So whatever Mr. Frederick would opine, and frankly, as has been discussed today, his opinions changed successively, and all of which were produced by the defense. I'm sorry, to the defense before trial. Well, not the testimony in the New York case, though, right? That. Are you referring to Simoes? Simoes. Yes, that was a case that was conducted by the U.S. Attorney's Office in New York. So you're right. There must have been a communication with colleagues on the West Coast, right? There was. In fact, there was a nationwide request that was put out by the U.S. Attorney's Office in New York saying we have this defense witness coming on. Is anyone familiar with this expert? And Mr. Durkin responded yes, and provided non-grand jury material, which was the 2006 and 2007 report, which led to questions. Now, there are three statements that's made in Simoes, and there's nothing there that we would consider is not exculpatory. First, he says the two reports are not inconsistent. The defendant had them. Anyone can look at those reports and see and make that conclusion. That self-serving statement doesn't make it exculpatory. The statement that the video does not show the actual strikes that would need to come from another witness is entirely consistent with everything that's been presented in this case. So the fact that he says, I'm just the video guy, I just look at the video, you need someone else to show impact, nothing in that is exculpatory. So while under – Well, I guess you said there were three statements, and I thought you were going to get to the third. I thought the one that was most damning was that he said, no, I never changed my opinion from the initial report to the supplemental report. He said that they weren't inconsistent. That, to me, is simply a self-serving statement. Anyone can look at those reports and draw their own conclusion of whether or not they are not inconsistent. It seems to me he's tying it to his opinion that I never said that there are actual strikes that make impact in the reports in that case. I guess I'm a little puzzled as to why you're fighting this. I thought you all had conceded that that testimony should, in fact, have been turned down. Yes, under Jenks and under the U.S. Attorney's policy, it should have been produced. But that small nondisclosure of a couple pages certainly doesn't rise to the level of prejudice that can change what the defense could have done. It doesn't change his theory of the case. His theory of the case isn't going to change the defendant's statement and his admission that he struck Mr. Zim twice. It's not going to change the witnesses. Let me just be clear. I mean, what bothers me about what happened here, it's – fine, you may be right that their theory of the case isn't going to change. But, I mean, as I understand it, they would have called this guy in their own case. And they could have. He was on the witness list. But you all had misled them into thinking that he would have these very damning opinions against them when, in fact, just the opposite was true, right? I don't – we – they had all of Mr. Frederick's opinions that – let me fix that. The district court found that there were a few statements that were not included in the 302. Those three statements were, in fact, included in other materials that they already had. The comment about motion blur is already addressed in the 2007 report and explained in detail in the grand jury testimony. His later statement that the baton is not visible in the images, he says the absolute opposite in his grand jury testimony. His statement about, well, maybe the defendant was crouching, maybe he was ducking, the defendant never even says that. So it's unclear how any of that could be helpful. Mr. Frederick's was on their witness list. They could have called him. There is nothing – the statement in the Rule 16 summary is not so significant that – to lead to a wholly different view. It should be remembered that the 302 precedes his 2007 report. The Rule 16 summary says this is based on his 2007 report, and the 302 precedes his grand jury testimony. And then on the eve of trial, the United States produced tons of videos of minimal clips that Mr. Frederick's had prepared. So he had all of this evidence before him of what Mr. Frederick's opinions were. He could have made the decision to call him, and he didn't, just as he had several other experts and witnesses on his list that he didn't call. I guess what is troublesome is that, you know, we're obviously looking in hindsight. But when you have everything in front of you, it affects how you put your case together. It would have affected how they may have questioned their own video expert. It may have affected, as they say, some of the citizen witnesses. They would have had a whole, you know, corroboration for this artifact theory and the uncertainty about the artifacts and what's a blow and what's a movement. And it's hard to see how that wouldn't have impacted how they put their case together and how they presented their case. So that's the part that troubles me that I'd be interested in your comments on. Several things. First, they did have Mr. Schott, who he recognizes did have many similar opinions. He could have used that. He had Mr. Frederick's opinions that he could have used to cross-examine. He did cross-examine the eyewitnesses with respect to where their memories were different from what was on the video. And, again, this case isn't simply dependent on what is on the video. You have Mr. Thompson's statement. You have the eyewitnesses. None of the eyewitnesses corroborate the defendant's version of what Mr. Zemp's actions were that preceded his strikes and the continuing firing of the taser and the following 11 strikes. So, of course, this court must look at what is the impact. But he can't change the defendant's statement. And he can't change the fact that you don't need to be an expert in video analysis to see that Mr. Zemp first turns and sees the defendant at 18-26-12. So if you go to Camera 1 on Exhibit 8, Camera 1 has the PowerPoint slides that you can toggle through on an individual basis. At frame 60, that's when Mr. Zemp first sees the defendant, 18-26-12. You also don't have to be an expert to see at 18-26-16, he's on the ground. So you have those four seconds. You can't change those four seconds. Whether or not you can see a baton strike image in there isn't going to change the fact that his story has to fit within those four seconds. And I think you can simply take a stopwatch and go through the conversation and do two motions, and it's not going to happen. You can't say drop the pop, why drop the pop now, and do two strikes and have that happen in four seconds. So it's not going to change his version of the events. It's not going to change the witnesses who all say they saw two overhand strikes, they saw that the defendant never stopped moving forward. It's not going to change the ability to see on the video that Mr. Zemp is constantly moving backwards, presenting no threat to the defendant. So it's not going to change in a significant way to undermine confidence. You had another fact in there that was challenged. We didn't talk about it in their discussion, but it's in the brief, and that's about the Pepsi bottle and the testimony that Mr. Zemp went every other day to one of these convenience stores and bought Pepsi. Yes. I was concerned about the admission of that, and let me tell you why, because that's like saying every day you went to a store and you bought a brick. That's harmless, right? That doesn't mean that the 10th day you bought a brick that you didn't use the brick as a weapon. So I felt like in admitting that Pepsi testimony that it was basically to polish up, you know, against the notion that the Pepsi bottle might have been used as a weapon. So what's the justification for the fact that he bought Pepsi before? How does that say whether or not he's going to use a Pepsi bottle as a weapon or as a threat on the day in question? It's in response to the defendant's allegation that Mr. Zemp saw him when he entered and he purposely went to the Pepsi display in order to retrieve it. And the video will show that Mr. Zemp's back is to Mr. Thompson the entire time when he walks into the store. Mr. Gill explained that if you can assess his walking speed, he's actually walking slower than a regular pace. He's basically sauntering and he's going to buy Pepsi. That it's meant the purpose of his shopping habits is meant to address he did not enter the store with a nefarious purpose or for the purpose of engaging in a preemptive strike. But the fact that he didn't enter the store with that notion doesn't necessarily mean that of the moment when confronted by an officer, it doesn't tell you anything about his conduct then, does it? It addresses why he picked it up. It addresses why he was in the store, why he picked up the bottle, and the fact that he picked up the bottle before he turned around and first saw the defendant. None of the witnesses say that he held it above his head or held it in that steadfast lock position as the defendant described. Everyone said that when he's holding the Pepsi bottle, when he's on the floor, is he's holding it in defensive position as a way to protect himself from the repeated blows. That there's nothing in the, none of the witnesses say that he's holding the bottle as described by the defendant before he struck him twice. That. Let me just ask you a hypothetical question. Let's say that after you had produced all of the materials as you were describing earlier to the defense on Mr. Frederick's various opinions, shortly before trial he came to you and said, you know what, I've gone back over this stuff in preparation for trial, and I've got to tell you, I come out the other way now. I just, I can't, I'm not going to be able to testify consistently with the opinions I've given before. I now agree with the defense expert X, Y, or Z. You'd concede obviously that that would need to be turned over, right? Yes. Okay. And would it be material on these facts if that had happened? No. I mean, because ultimately the jury had to reject the defendant's version of the events to convict him on both counts. And I don't see that Frederick's opinions as to what is or isn't shown on the video is going to change that they ultimately had to reject what the defendant presented as his explanation of how the events occurred and his justification for his use of force. Well, so then you would have no obligation in those circumstances to turn over the new opinion? I think under Jenks and under the U.S. Attorney's policy we would have had an obligation to do so. You're not going to call him, obviously, so there's no Jenks issue. I agree with that. I just think that... Do you concede that that would be material and you'd have to turn it over, right? I guess it depends. Are we saying material in the sense of being prejudicial? Yes, that you would violate Brady if you didn't turn over the new opinion. You have to concede that, right? If he came forward and completely changed his opinion, yes. Okay. So I guess why isn't the New York testimony getting in that, getting into that space? Getting in that box? Yeah. Because he didn't say he completely changed his opinion. He said the 2006 report is not inconsistent with his 2007. I mean, do you have the actual testimony? I don't remember him saying it's not inconsistent. I remember him saying, I never changed my opinion from what I initially said in 2006. Am I wrong on that? I believe he said it's 2006. It's not different. Okay. It's in the record at pages 3229 to 3230. 32? 3229 to 3230. Excuse me. Okay. I don't have it in front of me. What does he say? Are you aware that the FBI launched an investigation and you changed your mind about what the video showed? No, that's not true at all. In your initial report that you gave to the Spokane Police Department, that was incorrect, wasn't it? No, it was not incorrect. No, not at all. The FBI asked me if I pursue a specific focus on one specific area as opposed to multiple videos over a long period of time. So they wanted me to focus on one area, flesh that out. But there's no inconsistency. In that report, you concluded the officer did not hit the mentally disabled individual with a baton. Absolutely not. No, no. I concluded the video did not show the baton striking the individual significantly different than whether he hit him. So he's simply saying the two reports are not inconsistent. And in his post-trial deposition, he conceded that he labeled the report a supplemental report and not amended report because that was his desire, basically, to not have it look like it was something different. But it was somehow supplemental. Additional is different than something being amended. So, again, the defendant had the two reports. Anyone can look at them and see when he says in the 2006 report, there's no baton use for the first minute and 13 seconds. It's radically different than what he writes in the second report. But he's not saying I agree. He's simply trying to self-justify his two reports. I don't see that as akin to saying, you know, I now think there's nothing on the video that supports the United States. He's saying they're not inconsistent. Right. And, again, we did not rely on the video to show the impact of the baton strikes. It's the witnesses that provided that testimony. So these two pages in Simoes are on a basis to say that everything would so dramatically change in how he could present his case. If Frederick had been prepared to testify at trial that the purported strikes of 1826, 14 through 1826, I forgot what the cutoff number is, were not strikes, would that have been material? In other words, Frederick, hypothetically, I realize this isn't what he said, but if he said those were not strikes, those were results of compression. I mean, it still seems to me it all goes back. It's not going to change. It can't change the defendant's version. It can't change the eyewitnesses. So the fact that he doesn't see it on the video, I don't see how that becomes. It may be something we would have produced. We produced a lot of things that may not violate. I'm just talking about materiality, though, at the moment. Is it material if those were not strikes? I don't think it ultimately changes it because you still have the defendant's statement. You still have the eyewitnesses. You still have the other evidence that shows that he made two overhand baton strikes. The fact that it's not on the video doesn't change those witnesses' testimony. It doesn't change the defendant's statement that he made those two strikes. It doesn't change the timing of when he falls to the ground. It's that so I don't think it's going to rise to the level of prejudice of changing, of undermining confidence in the verdict. Thank you. Thank you. Why don't you change his time to four minutes? Give him some more time. The government just didn't sit passively and listen to our experts' shots opinion when they argued that we had our own expert. They challenged Shot's opinion. They cross-examined Shot. They challenged Shot with respect to what his opinions were, all while having information that we could have utilized to rehabilitate Shot. Shot could have said, that's my opinion. And based upon the information that I reviewed, had the accurate information been in the disclosures of the Frederick's report, he could have said, and that's consistent with what your experts have said. But you had the reports. Judge, we had the reports. But as the district court pointed out, and as Ben versus Lambert points out, the reports came in a series, right? And there's 2007 and then the Rule 16 and the supplemental and then ultimately the 302 from the FBI. We have a right to rely upon that. And the information that came from the FBI. The point is that to the extent there's inconsistencies there, they were there. And your expert had the ability to see how to navigate between and among. You didn't know who may or may not be called. So what didn't you have? I didn't have his exculpatory opinions that the video didn't show that there were baton strikes at those two areas, number one. I didn't have his demonstrations indicating what the significance of motion was and why that wasn't a baton strike. And how does that square then as the government spent so much time on with his own statement about the strike and with the timing of the falling to the ground, which doesn't seem to be disputed. So how does that fit in? That's a very good question. The defendant has never said, I didn't strike him. And he's never said he fell to the ground after I struck him. The defendant didn't say that, but there's other testimony about falling to the ground and then there is video testimony on that. There absolutely is. But the issue is really the timing of it. When the government says it's four seconds, well, that's just simply not an accurate interpretation. You don't see Mr. Zim at some point in time because there are shelves, right? And he and sometimes the defendant are below the shelves. No one knows when he hits the ground to begin with. There were witnesses who testified consistently with what Officer Thompson said, that he came in, that he appeared to stop momentarily. Ballows, there was a brother and a sister or a husband and wife who were outside. They couldn't hear what he said, but his lips were moving. The defendant said, I came in, I came to stop. I commanded him to drop the two-liter bottle. Michael Dahl, the one witness who was an eyewitness, said exactly that until the government took the video itself and said, no, no, the baton strikes are here. You didn't see the first baton strike. Therefore, you didn't hear Officer Thompson make his commands prior to the first baton strike. You might have heard it later with other baton strikes, but you didn't hear it at the time of the first baton strikes. And that's the significance of the timing of the baton strikes. The defendant's story, when they say it won't change, the defendant's story is, I came in and I issued commands. And after the commands weren't followed and I perceived threatened behavior, I struck. And Mr. Frederick's – What's his threatening behavior? He had tensed, according to the defendant, he had the top bottle, not holding it, cradling it or holding it, but he held it horizontally with tensed muscles and with one foot forward. And the police officer interpreted that as the potential that Mr. Zem was going to use the bottle to throw it, use it as a distraction or use it as a weapon. It's very easy to look at something in hindsight, but holding a two-liter plastic pop bottle doesn't strike me as being much of a threat. They're hard as a rock, Judge. And, you know, when I first saw that, I thought, God, how can a pop bottle be a threat? But even the government's experts, when you feel the two-liter bottle, it's as hard as this podium, and it weighs three, four pounds, and so it can be thrown as a weapon to distract, to give a tactical advantage in a interaction. Police officers perceive things different than the rest of us do. They are trained to do that. I think the record strikes demonstrates that exactly in Samoa, that Mr. Frederick said, I did not change my opinion. And when you look at the fact of what we had the right to present and the fact that the government challenged it, they challenged Schott's testimony. So when they said, well, you had Mr. Schott, that's true. But they also cross-examined him and called into question the very opinions that he was offering, all while being armed with the fact that their only forensic video expert possessed many of a similar type of opinions. Judge, that doesn't make it cumulative. The opportunity to cross-examine differently, to cross-examine Mr. Gill, to cross-examine the use of force experts who interpreted a video, and to bring out the fact that their video interpretation was a misinterpretation, as evidenced by the government's own expert's opinion, is a material issue. But you did have the only video expert, right? We did indeed have the only video expert, Judge, but we didn't have the information to cross-examine the witnesses that the government had. We didn't have the information that the reports that they reviewed. Mr. Gill's report, Mr. Frederick's two reports, the information that they reviewed that didn't contain the exculpatory stuff. We were deprived the opportunity. Had we had that in there, had the reports contained exculpatory information, had they contained the information that Frederick's comes forward and said, we could have cross-examined Mr. Gill. You're interpreting this video, sir. You're not a forensic expert. And the only forensic expert that the government hired, whose report you reviewed, says that that didn't occur. Your interpretation is wrong. Same with Mr. Bragg. Same with Mr. Callanan. And when Mr. Dahl changed his testimony at the government's urging, we could have said, now, they told you that that's the first baton strike to convince you that you didn't hear the commands? Did they tell you that their own very own video expert said that that is a misinterpretation, that is not a correct interpretation of the video? That type of cross-examination, Judge, could have been effective, and you have to ask whether or not that undermines the confidence in the trial. Can the government sit on the information, challenge our expert, and now argue, well, it was cumulative? Thank you. Thank you, Judge. Thank you. Thanks to both counsel for your argument and also for the briefing. The case just argued, United States v. Thompson, is submitted, and we're adjourned for the morning.
judges: Whyte, McKEOWN, WATFORD